

# NUMBER 13-22-00162-CR

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI – EDINBURG

---

**HOLLIS LANE WILLINGHAM,** Appellant,

**v.**

**THE STATE OF TEXAS,** Appellee.

---

### On appeal from the 369th District Court of Leon County, Texas.

---

# MEMORANDUM OPINION

### Before Chief Justice Contreras and Justices Benavides and Longoria
### Memorandum Opinion by Chief Justice Contreras

A Leon County jury convicted appellant Hollis Lane Willingham of the 2007 capital murder of Jim Craig Martin. As the State did not seek the death penalty, Willingham was sentenced to life imprisonment without parole. *See* TEX. PENAL CODE ANN. §§ 12.31(a)(2), 19.03(a)(2). On appeal, he argues: (1) the evidence was insufficient to corroborate accomplice and inmate testimony; (2) the trial court failed to submit a proper accomplice

witness instruction in the jury charge; (3) the trial court failed to submit a jailhouse informant witness instruction in the jury charge; and (4) the judgment assessed unauthorized costs and fees. We affirm as modified.[1]

## I.  BACKGROUND

An amended indictment alleged that, on or about August 7, 2007, Willingham intentionally caused Martin's death by shooting him with a firearm, while in the course of committing or attempting to commit robbery or kidnapping. *See id.* § 19.03(a)(2). Trial took place between March 29 and April 4, 2022.

## A.  McDougald

Andrea McDougald testified that she dated Willingham in the summer of 2007, at which time she was five or six months pregnant from a prior relationship. She recalled that her car broke down in Vidor around the beginning of August, but when she called Willingham for help, he was not able to come because "[Martin] had not given him the money that he owed him so he could drive down there to get me." She explained that Martin owed Willingham about $150, and Willingham was mad because he could not come pick her up.

McDougald stated that Willingham picked her up from her father's house on August 6, 2007. Willingham was driving Martin's silver Honda Accord, and Martin was a passenger. McDougald said this was the first time she met Martin in person. They went to McDougald's friend's house, where Willingham and Martin used drugs. Later, they went

---

[1] This appeal was transferred to this Court from the Tenth Court of Appeals in Waco by order of the Texas Supreme Court. *See* TEX. GOV'T CODE ANN. § 73.001. Accordingly, we "must decide the case in accordance with the precedent of the transferor court under principles of stare decisis if [our] decision otherwise would have been inconsistent with the precedent of the transferor court." TEX. R. APP. P. 41.3.

to a residence in Bryan belonging to David Greer, where Willingham and Martin continued to use drugs into the early hours of the morning. Willingham, Martin, and McDougald eventually left in Martin's car to return to Normangee, where Willingham lived.

Around dawn, as Willingham drove the group in Martin's car along State Highway OSR,[2] "somehow the conversation turned to the money that [Martin] had owed [Willingham], and [Willingham] started to get angry." As Martin showed McDougald photos of "buff[] guys" on his cell phone, Willingham grabbed Martin's phone and "crushed it into little pieces." McDougald recalled that the car then "took a right onto a country road pretty hard." She said it was a dirt road through a heavily wooded area which "got more rural by the second." At some point, the car passed over a large culvert which "had water running through it," and it eventually came to a point where it "couldn't go any further" because "there was water over the road." McDougald testified:

> [Willingham] got out of the car and went around to [Martin]'s side of the car, opened his door, and made him get out. . . .He made [Martin] get out of the car, and he got [Martin] turned around, and got him in a headlock, . . . and . . . tr[ied] to choke him down. . . . And he told him there was no point in fighting it, and [Martin] stopped fighting him, and he choked him down to the ground. And the next thing I hear is a gunshot by my window.

She did not directly see Willingham shoot Martin, but she saw that Willingham had a ".22 long rifle revolver."

According to McDougald, Willingham instructed her to tear pieces of duct tape off of a roll which was lying on the rear floorboard; she could not recall whether this was before or after she heard the gunshot. McDougald said she complied with Willingham's

---

[2] OSR, which stands for "Old San Antonio Road," is the only state highway in Texas with a completely alphabetical designation. *See* TEX. DEP'T OF TRANSP., *Highway designations*, https://www.txdot.gov/projects/planning/highway-designations.html (last visited June 14, 2023).

3

request because "it didn't seem like a good idea" to disobey him "at that current time." She testified that she handed the pieces of tape to Willingham, and Willingham "bound [Martin]'s hands and feet" and "push[ed] him off the culvert . . . into the rushing water."

McDougald said Willingham "previously had made a comment about put[ting Martin] in a potato cellar" a week or two earlier, but she took it as a joke and did not know Willingham planned to rob or harm Martin. She said she was afraid that if she challenged Willingham, she "was going to end up pushed off the culvert like [Martin]."

After the shooting, Willingham drove Martin's car to a storage facility in Normangee; McDougald did not know why they went there. At some point, a woman "on a bicycle came up from the side" and Willingham "ran her down." McDougald said the woman was "underneath the tires" for a "good amount of time" and was screaming. She recalled that Willingham said something to the effect of, "[s]he has a big mouth." Later, Willingham drove to a place "where there [were] tall blood weeds" and said "he wanted to cover [the car] up," so he placed a "stick" on the back of the car.

Willingham and McDougald then walked back to Willingham's residence. When they got there, Willingham's associate Orval Hixon was waiting there to give them a ride back into town. According to McDougald, Hixon gave Willingham .22-caliber shells. Also, Willingham "burned all of his clothes" in a "fire pit" on his front lawn. Hixon then drove Willingham and McDougald to Willingham's grandmother's house. While they were there, McDougald asked Willingham to "retrieve the duct tape off of [Martin]" because "[her] fingerprints were all over [it]" and she thought she "would go to prison for the rest of [her] life." Willingham left, but when he came back, he told McDougald that he did not retrieve the duct tape; McDougald then hit Willingham with a package of cookies that she had

4

been eating. In response, Willingham "immediately flipped [her] over" and "[s]lamm[ed] [her] on [her] head." She said her eyes were bruised the next day. She did not see Willingham again until she visited him in jail the following year.

## B.     Greer and Gross

Greer testified that Willingham, McDougald, and Martin came to his house on August 7, 2007, and asked him to buy drugs for them. He took Martin's car, went to obtain methamphetamine, and brought it back to his house. At that time, Greer gave Willingham a .22-caliber pistol and, in exchange, Willingham gave Greer a .380-caliber pistol. Greer said he was arrested with the .380 two days later.

Kimberly Gross lived with Greer and was present on the night in question. She said Willingham, McDougald, and Martin arrived at Greer's house around 2:00 a.m. and departed before dawn. Gross said that, at one point that evening, she spilled a pan while cooking; Martin helped her clean up and the two had an extended conversation. According to Gross, Martin "was shocked that [Gross] was still talking to him after realizing that he was gay"; Gross said Martin was an "amazing person," and she was not bothered by his sexual orientation. Gross testified that Martin told her that he had sex with Willingham in exchange for drugs and that "he was in love with [Willingham]," but Willingham was not in love with him. She said Willingham overheard this part of the conversation and became angry.

Gross said that she was arrested along with Greer two days later on an unrelated offense. After she was bonded out by Greer's father, she saw a news report that Martin was missing. When she discussed this with Greer, Greer told her: "Don't say another word." Later, when Greer came back from visiting Willingham, Greer said "it was weird

5

over there" and that Willingham looked like he had blood on him.

Gross recalled telling police in 2009 that Greer said Willingham was burning clothes in a fire. She also recalled that she told police that Willingham had been talking to her about "a couple of people he said he had off[e]d." She did not take him seriously at the time because "[h]e just didn't seem like the type." On cross-examination, Gross acknowledged that she told police that Willingham's associate Casey Ramsey "was bragging about how [Ramsey] off[e]d the gay guy." She admitted having told police that she was more scared of Ramsey than she was of Willingham.

## C.    Police

Victor Smith of the Leon County Sheriff's Office testified that he was dispatched to Normangee to investigate a hit-and-run on August 7, 2007. The victim, Barbara Allen, identified Willingham as the driver of the car that hit her, as did a bystander witness.[3] The following day, officers discovered Martin's silver Honda Accord completely burned out and abandoned in a rural area off of OSR and Batson Loop. Car parts recovered from the hit-and-run scene were consistent with the burned-out car, and police determined that the car belonged to Martin, who was reported missing on August 10. Smith became the lead investigator into Martin's disappearance. He stated that Martin's remains were never found.

As part of the investigation, officers interviewed a relative of Willingham who reported that, after Willingham burned Martin's car, Willingham's grandmother "[took]

---

[3] Allen testified that the car driven by Willingham ran her over four times and "left [her] for dead," and that she spent over three months recovering in a hospital. Allen agreed with the prosecutor that she saw both Willingham and Martin in the car.

possession of Martin's wallet and credit card." According to police, the relative reported that Willingham's grandmother "cut up the credit card and disposed of the wallet."[4]

In an interview with police in 2011, Willingham said that his memory of the week of August 7, 2007, was "foggy" but that the last time he saw Martin was when "he dropped me off at my grandma's house." He said: "I don't remember killing nobody." He also said that Ramsey was not with the group that night and "wasn't involved." In a subsequent interview with police in 2019, Willingham said he would typically see Martin on the first week of every month in 2007. He said he "shot up 60 units" of methamphetamine with Greer on the night of August 6, 2007, which an officer testified was a very high dose. As to the incident with Allen, Willingham told police: "I did not knowingly run that lady over."

Phone records obtained by police indicated that Martin's cell phone was last used at around 6:51 a.m. on August 7, 2007, when it communicated with a Verizon cell tower located between Bryan and Normangee.

## D. Jailhouse Informants

Gerardo Zepeda testified that he was incarcerated in the Limestone County Detention Center in 2007 and Willingham was his cellmate at one point. Zepeda said Willingham told him "he popped somebody," which Zepeda understood to mean he shot someone. According to Zepeda, Willingham told him the shooting victim was a male; that the man owed him money; that the shooting happened "in the country"; that "they wouldn't find him" because "[a]nimals got to him"; and that Willingham was worried because his pregnant girlfriend knew about it. Zepeda agreed that he offered all of this information to

---

[4] Defense counsel did not object to this testimony on hearsay or any other grounds.

law enforcement because he "was trying to get a deal" on his pending charge; however, he said he was eventually convicted and sentenced without any plea agreement with the State.

Christopher Nabors testified that, when he was housed in the same unit as Willingham, he made a "homemade tattoo gun" out of a "pair of hair clippers" and "needles from a wire brush." Nabors said Willingham asked for a tattoo of "a shovel, two headstones, and a hole in the ground." When Nabors asked why, Willingham told him "he wanted one headstone for the person he had already put in the ground, and a hole for the person that needed to go in the ground." Nabors added a third headstone because he "thought three would look better, just to balance it out." Nabors acknowledged that he had a pending charge in Lubbock County and that, in exchange for his testimony, the State agreed to contact the Lubbock County District Attorney's Office to advise them of his cooperation.

## E.     Other Witnesses

Charles Ghormley testified that he lived near Willingham and, around 2005 or 2006, he helped Willingham build a porch on his property. While they were working on the porch, Willingham pointed "over to the southwest of his house" and said, "If you need to get rid of a body, put it in the creek."

James Weathers testified he was the chief of police in Normangee from around 2002 to 2008, and he knew Willingham. In around 2002 or 2003, during a casual conversation, Willingham told Weathers that "the perfect way to commit a murder is to kill the person and feed them to the alligators."

8

**F.     Verdict and Judgment**

The jury convicted Willingham of capital murder and he was sentenced to life imprisonment without parole. The judgment of conviction assessed $3,027.22 in court costs. This appeal followed.

## II.     DISCUSSION

**A.     Corroboration of Accomplice and Jailhouse Informant Testimony**

By his first issue, Willingham argues that the evidence was insufficient to corroborate the accomplice testimony of McDougald and the jailhouse informant testimony of Zepeda and Nabors.

### 1.     Applicable Law and Standard of Review

Article 38.14 of the Texas Code of Criminal Procedure provides that a "conviction cannot be had upon the testimony of an accomplice unless corroborated by other evidence tending to connect the defendant with the offense committed; and the corroboration is not sufficient if it merely shows the commission of the offense." TEX. CODE CRIM. PROC. ANN. art. 38.14. Similarly, article 38.075 provides:

> A defendant may not be convicted of an offense on the testimony of a person to whom the defendant made a statement against the defendant's interest during a time when the person was imprisoned or confined in the same correctional facility as the defendant unless the testimony is corroborated by other evidence tending to connect the defendant with the offense committed.

*Id.* art. 38.075(a). As with article 38.14, corroborating evidence is not sufficient for the purposes of article 38.075 if it "only shows that the offense was committed." *Id.* art. 38.075(b).

The accomplice witness corroboration rule is based on "a legislative determination

9

that accomplice testimony implicating another person should be viewed with a measure of caution, because accomplices often have incentives to lie, such as to avoid punishment or shift blame to another person." *Zamora v. State*, 411 S.W.3d 504, 509–10 (Tex. Crim. App. 2013) (citing *Blake v. State*, 971 S.W.2d 451, 454 (Tex. Crim. App. 1998)); *see Walker v. State*, 615 S.W.2d 728, 731 (Tex. Crim. App. [Panel Op.] 1981) ("[T]he testimony of an accomplice witness is to be carefully scrutinized not only because of any interest he or she might have but because his [or her] testimony is evidence from a corrupt source."). The jailhouse informant corroboration rule is based on an analogous rationale. *See Phillips v. State*, 463 S.W.3d 59, 66 (Tex. Crim. App. 2015) ("Jailhouse-witness testimony is inherently unreliable due to the inmate's incentive to better his circumstances."). Accordingly, the law applying to cases involving corroboration of accomplice witness testimony also applies to cases involving corroboration of jailhouse informants. *Schnidt v. State*, 357 S.W.3d 845, 851 (Tex. App.—Eastland 2012, pet. ref'd); *Ruiz v. State*, 358 S.W.3d 676, 680 (Tex. App.—Corpus Christi–Edinburg 2011, no pet.).

When a conviction is based in part on both accomplice and jailhouse informant testimony, and the appellant challenges the sufficiency of corroborating evidence under both articles 38.075 and 38.14, we apply the statutes together. *See Ruiz*, 358 S.W.3d at 681; *see also Trevino v. State*, No. 13-11-00767-CR, 2013 WL 1883080, at *4 (Tex. App.—Corpus Christi–Edinburg May 2, 2013, pet. ref'd) (mem. op., not designated for publication). That is, we measure the sufficiency of the corroborating evidence by eliminating all of the accomplice testimony *and* jailhouse informant testimony from consideration and then examining the remaining portions of the record for any evidence that tends to connect the appellant with the commission of the offense. *Ruiz*, 358 S.W.3d

at 681; *see Patterson v. State*, 204 S.W.3d 852, 859 (Tex. App.—Corpus Christi–Edinburg 2006, pet. ref'd) (concluding that it "would be absurd" to allow accomplice testimony to corroborate covert agent testimony under article 38.141, and vice versa, "in light of the legislature's clear action to disfavor such evidence and to hold it insufficient for conviction as a matter of law"); *see also Brooks v. State*, No. 01-16-00070-CR, 2017 WL 1173889, at *10 n.7 (Tex. App.—Houston [1st Dist.] Mar. 30, 2017, pet. ref'd) (mem. op., not designated for publication) (citing *Patterson* and declining to consider jailhouse informant testimony in its evaluation of whether accomplice testimony was sufficiently corroborated); *Trevino*, 2013 WL 1883080, at *4 (same).[5]

The corroborating evidence "does not have to directly link appellant to the crime, nor does it alone have to establish his guilt beyond a reasonable doubt." *McDuff v. State*, 939 S.W.2d 607, 613 (Tex. Crim. App. 1997); *Dowthitt v. State*, 931 S.W.2d 244, 249 (Tex. Crim. App. 1996). Rather, there must simply be "some" other evidence "which tends to connect appellant to the commission of the offense alleged in the indictment." *Castillo v. State*, 221 S.W.3d 689, 691 (Tex. Crim. App. 2007). Even "apparently insignificant incriminating circumstances" may sometimes be sufficient to corroborate under articles

---

[5] In *Phillips v. State*, the Waco Court of Appeals held that the trial court did not err by failing to instruct the jury "that the testimony of the jailhouse witnesses could not corroborate the testimony of the accomplice." No. 10-12-00164-CR, 2015 WL 7443625, at *2 (Tex. App.—Waco Nov. 19, 2015, pet. ref'd) (mem. op. on remand, not designated for publication) (noting that "[s]uch a limitation is not included in either the jailhouse-witness corroboration statute or the accomplice-witness corroboration statute" and appellant "cites no authority, and we have found none, supporting such a limitation or requiring that such an instruction be given"); *see also Gray v. State*, No. 11-16-00358-CR, 2018 WL 6928987, at *5 (Tex. App.—Eastland Dec. 31, 2018, no pet.) (mem. op., not designated for publication) (holding that accomplice testimony can be used to corroborate covert agent testimony). The State argues that *Phillips* controls because it is the precedent of the transferor court. *See* TEX. R. APP. P. 41.3. However, because *Phillips* was not designated for publication, it "ha[s] no precedential value." TEX. R. APP. P. 47.7(a). Therefore, even though *Phillips* arguably conflicts with our precedent, Rule 41.3 does not require us to follow it here.

38.14 and 38.075. *Dowthitt*, 931 S.W.2d at 249. "[W]hen there are conflicting views of the evidence—one that tends to connect the accused to the offense and one that does not—we will defer to the factfinder's resolution of the evidence." *Smith v. State*, 332 S.W.3d 425, 442 (Tex. Crim. App. 2011).

> An accomplice is someone who participates with the defendant before, during, or after the commission of a crime and acts with the required culpable mental state. To be considered an accomplice witness, the witness's participation with the defendant must have involved some affirmative act that promotes the commission of the offense with which the defendant is charged. A witness is not an accomplice witness merely because he or she knew of the offense and did not disclose it, or even if he or she concealed it. In addition, the witness's mere presence at the scene of the crime does not render that witness an accomplice witness.

*Druery v. State*, 225 S.W.3d 491, 498 (Tex. Crim. App. 2007) (footnotes omitted).

### 2. Analysis

Willingham contends that "the evidence raises a fact issue regarding whether McDougald was an accomplice" and therefore, "the trial court should have instructed the jury about the corroboration requirement" of article 38.14.[6] The jury charge in this case contained an instruction precisely tracking article 38.14; however, it did not define accomplice, and it did not ask the jury to determine whether McDougald was an accomplice as a matter of fact.

In any event, even assuming McDougald was Willingham's accomplice, we find sufficient evidence to corroborate her testimony and that of Zepeda and Nabors. A defendant's behavior or actions prior to or following an offense may tend to connect the

---

[6] "A witness who is indicted for the same offense or a lesser-included offense as the accused is an accomplice as a matter of law." *Smith v. State*, 332 S.W.3d 425, 439 (Tex. Crim. App. 2011). Willingham does not argue that McDougald was his accomplice as a matter of law.

12

defendant with the commission of the offense. *Smith v. State*, 332 S.W.3d 425, 445 (Tex. Crim. App. 2011). Gross testified that, in the early morning of August 7, 2007, Willingham became angry at Martin after he overheard Martin telling Gross that he was in love with Willingham and that he had sex with Willingham in exchange for drugs. She also testified that, after Greer was at Willingham's residence, Greer told her it looked like Willingham had blood on his shirt. Gross additionally told police that Willingham had talked to her about "people he had off[e]d."

Greer and Gross testified that Willingham left Greer's residence with Martin at around dawn on August 7, 2007, which was shortly before Martin's cell phone made its last communication with a cell tower. Allen testified that, later that morning, Willingham ran her over while he was driving Martin's car. And according to police testimony, a relative of Willingham reported that Willingham burned Martin's car and, afterward, Willingham's grandmother disposed of Martin's wallet and credit card. All of this evidence, taken together, tends to connect Willingham to Martin's murder.

Willingham argues that the aforementioned evidence is not sufficient to corroborate under articles 38.14 and 38.075 because it was "riddled with contradictions." He notes in particular that Allen stated Martin was in the car with Willingham when she was run over, which would not have been possible if Martin had been murdered beforehand as McDougald claimed. He suggests that "Gross's credibility is suspect because she was offered immunity." And he observes that, to the extent police testimony established that he burned Martin's car, that testimony was hearsay. But unobjected-to hearsay has probative value. TEX. R. EVID. 802. Moreover, the fact that evidence is disputed or controverted does not mean that it cannot serve as corroborating evidence.

13

*See Smith*, 332 S.W.3d at 442.

Citing *Herron v. State*, Willingham argues that "non-accomplice evidence may be insufficient if it is weak and contradicted by other evidence." 86 S.W.3d 621, 632 (Tex. Crim. App. 2002) (citing *Saunders v. State*, 817 S.W.2d 688, 692–93 (Tex. Crim. App. 1991)). *Herron* does not stand for this proposition. In that case, the court of criminal appeals considered whether the appellant had suffered egregious harm due to the lack of an accomplice witness instruction. *Id.* The Court noted that "[u]nder the egregious harm standard, the omission of an accomplice witness instruction is generally harmless unless the corroborating (non-accomplice) evidence is 'so unconvincing in fact as to render the State's overall case for conviction clearly and significantly less persuasive.'" *Id.* (quoting *Saunders*, 817 S.W.2d at 692). The Court observed that "[i]n *Saunders*, there was harm under this standard because the corroborating non-accomplice evidence was weak and was contradicted by other evidence." *Id.* The Court did not state or imply that non-accomplice evidence may be considered insufficient, for purposes of corroboration under article 38.14, if it is weak or controverted. Instead, corroboration requires only that there be "some" other evidence tending to connect appellant to the commission of the offense, *Castillo*, 221 S.W.3d at 691, and we defer to the jury's resolution of conflicts in the evidence. *Smith*, 332 S.W.3d at 442.

Willingham's first issue is overruled.

**B.    Jury Charge**

Willingham's second and third issues concern jury charge instructions. After a jury trial in a felony case, the trial court is required to submit to the jury a "written charge distinctly setting forth the law applicable to the case; not expressing any opinion as to the

14

weight of the evidence, not summing up the testimony, discussing the facts or using any argument in his charge calculated to arouse the sympathy or excite the passions of the jury." TEX. CODE CRIM. PROC. ANN. art. 36.14. We review the trial court's refusal to submit a jury charge instruction for abuse of discretion. *Wesbrook v. State*, 29 S.W.3d 103, 122 (Tex. Crim. App. 2000). A trial court has no discretion in determining what the law is or applying the law to the facts. *State v. Kurtz*, 152 S.W.3d 72, 81 (Tex. Crim. App. 2004).

If we find error in the jury charge, and the defendant preserved the alleged error by a timely request or objection, then we must reverse as long as the error was not harmless. *Reeves v. State*, 420 S.W.3d 812, 816 (Tex. Crim. App. 2013); *see Almanza v. State*, 686 S.W.2d 157, 174 (Tex. Crim. App. 1984). But if an error is not preserved at trial, it requires reversal only if appellant suffered "egregious harm" as a result of the error. *Nava v. State*, 415 S.W.3d 289, 298 (Tex. Crim. App. 2013) (citing *Almanza*, 686 S.W.2d at 171).

### 1. Accomplice Witness Instruction

As noted, the jury was instructed in the charge, pursuant to article 36.14, that accomplice witness testimony must be corroborated by other evidence tending to connect Willingham to the offense. *See* TEX. CODE CRIM. PROC. ANN. art. 38.14. The charge did not, however, instruct the jury to determine whether McDougald was Willingham's accomplice. By his second issue, Willingham argues the trial court erred by failing to include such an instruction in the charge.

A witness may be an accomplice as a matter of law or as a matter of fact. *Ash v. State*, 533 S.W.3d 878, 884 (Tex. Crim. App. 2017). "The evidence in each case will dictate whether an accomplice as a matter of law or fact instruction is required." *Smith*,

15

332 S.W.3d at 439. "A witness is an accomplice as a matter of law when the witness has been charged with the same offense as the defendant or a lesser-included offense, or when the evidence clearly shows that the witness could have been so charged." *Zamora*, 411 S.W.3d at 510. If a witness is an accomplice as a matter of law, the trial court must "affirmatively instruct[] the jury that the witness is an accomplice and that his testimony must be corroborated." *Id.* (citing *Druery*, 225 S.W.3d at 498–99). But if the evidence presented by the parties is conflicting, the trial court "should allow the jury to decide whether the inculpatory witness is an accomplice witness as a matter of fact under instructions defining the term 'accomplice.'" *Druery*, 225 S.W.3d at 498–99; *see Ash*, 533 S.W.3d at 884 ("If the record contains evidence that a witness may have been an accomplice, the issue should be submitted to the jury to decide whether the witness was an accomplice as a matter of fact."); *Zamora*, 411 S.W.3d at 510 ("[W]hen the evidence presented by the parties as to the witness's complicity is conflicting or inconclusive, then the accomplice-witness instruction asks the jury to (1) decide whether the witness is an accomplice as a matter of fact, and (2) apply the corroboration requirement, but only if it has first determined that the witness is an accomplice."). There must be "some evidence of an affirmative act on the part of the witness to assist in the commission of the charged offense before such an instruction is required." *Druery*, 225 S.W.3d at 499.

In their arguments pertaining to this issue, the parties incorporate by reference the arguments made in Willingham's first issue. Willingham contends that the evidence raised a fact issue as to whether McDougald was his accomplice because of McDougald's testimony that she gave Willingham duct tape for the purposes of binding Martin's hands. Willingham notes that McDougald "could not remember whether she tore off and gave the

16

pieces of duct tape to Willingham to bind Martin before or after he purportedly shot Martin." In response, the State argues that there was no "affirmative" evidence showing McDougald "acted with the required mental state" or that "she had any prior knowledge of or intent to be an accomplice" to Martin's murder.

We agree with Willingham that McDougald's testimony regarding the duct tape supported the submission of an instruction directing the jury to determine whether she was an accomplice. *See Zamora*, 411 S.W.3d at 510 ("Regardless of whether it identifies an accomplice as a matter of law or as a matter of fact, the jury instructions must also explain the definition of an accomplice."). The State argues that, even if such an instruction were warranted by the evidence, an instruction in the jury charge concerning the law of parties was sufficient to comply with the law.[7] We disagree. The law of parties instruction did not purport to define "accomplice," did not mention McDougald, and did not convey to the jury that a person who is liable as a party for the acts of the defendant should or may be considered an accomplice of the defendant for purposes of the accomplice witness corroboration rule. We conclude the trial court erred by failing to instruct the jury to decide whether McDougald, specifically, was an accomplice of Willingham as a matter of fact. *See* Tex. Code Crim. Proc. Ann. art. 36.14; *Ash*, 533

---

[7] The charge stated:

Our law provides a person is criminally responsible as a party to an offense if the offense is committed by his own conduct, or by the conduct of another for which he is criminally responsible, or by both. Each party to an offense may be charged with commission of the offense.

Mere presence alone will not make a person a party to an offense. A person is criminally responsible for an offense committed by the conduct of another if acting with intent to promote or assist the commission of the offense he solicits, encourages, directs, aids[,] or attempts to aid the other person to commit the offense.

17

S.W.3d at 884; *Zamora*, 411 S.W.3d at 510; *Smith*, 332 S.W.3d at 439–40; *Druery*, 225 S.W.3d at 498–99.

Because Willingham did not request the erroneously omitted instruction at trial, the jury charge error will require reversal only if he suffered egregious harm. *Nava*, 415 S.W.3d at 298. "An erroneous jury charge is egregiously harmful if it affects the very basis of the case, deprives the accused of a valuable right, or vitally affects a defensive theory." *Alcoser v. State*, 663 S.W.3d 160, 165 (Tex. Crim. App. 2022). A finding of egregious harm must be based on "actual harm rather than theoretical harm." *Id.* In reviewing for egregious harm, we consider "the entire jury charge, the state of the evidence, including the contested issues and weight of probative evidence, the argument of counsel and any other relevant information revealed by the record of the trial as a whole." *Almanza*, 686 S.W.2d at 171.

Willingham argues he suffered egregious harm from the error because: (1) McDougald's testimony spans 147 pages of the reporter's record—far more than any other witness other than Smith; (2) the "potentially corroborating evidence" was "riddled with contradiction"; (3) the prosecutor emphasized McDougald's testimony at closing argument; and (4) the prosecutor "falsely" argued at closing that Zepeda and Nabors could corroborate McDougald's testimony.

As previously noted, "[u]nder the egregious harm standard, the omission of an accomplice witness instruction is generally harmless unless the corroborating (non-accomplice) evidence is 'so unconvincing in fact as to render the State's overall case for conviction clearly and significantly less persuasive.'" *State v. Ambrose*, 487 S.W.3d 587, 598 (Tex. Crim. App. 2016) (citing *Herron*, 86 S.W.3d at 632). "In assessing the strength

18

of the non-accomplice evidence, we examine (1) its reliability or believability, and (2) the strength of its tendency to connect the defendant to the crime." *Id.*

After reviewing the entire record, we conclude that the error did not cause Willingham to suffer egregious harm. Although McDougald was the only witness to testify that Willingham fired a gun on August 7, 2007, there was ample other testimony connecting him to the crime, including all of the testimony previously discussed in our analysis of Willingham's first issue. The non-accomplice evidence additionally included Zepeda's testimony that Willingham admitted he "popped" a man who owed him money "in the country" and that his pregnant girlfriend knew about it. Although Zepeda's status as a jailhouse informant means his testimony may be "inherently unreliable," *Phillips*, 463 S.W.3d at 66, his testimony was specific and strongly linked Willingham to Martin's murder. *See Ambrose*, 487 S.W.3d at 598.

Moreover, the jury was entitled to believe McDougald's testimony that she did not participate in the crime with the requisite mental state; and if it did so believe, then corroboration of her testimony would not have been required. It is safe to assume that, because it found Willingham guilty, the jury generally believed McDougald's testimony regarding the immediate circumstances surrounding the shooting. We find it highly unlikely that the jury generally credited McDougald's testimony regarding the shooting but did not believe her testimony that she did not intend to commit murder when she gave Willingham duct tape. *See Druery*, 225 S.W.3d at 498 (noting that an accomplice is someone who "acts with the required culpable mental state"); *see also* TEX. PENAL CODE ANN. § 19.02(b) (defining murder). Thus, even if the jury had been properly instructed, considering the jury's ultimate verdict, it is extremely unlikely that it would have found that

19

McDougald was an accomplice as a matter of fact. Willingham has not shown actual harm stemming from the omission of the subject instruction. *See Alcoser*, 663 S.W.3d at 165.

We cannot conclude the error affected the very basis of the case, deprived Willingham of a valuable right, or vitally affected a defensive theory. *See id*. Willingham's second issue is overruled.

### 2.    Jailhouse Informant Witness Instruction

By his third issue, Willingham argues the trial court erred by failing to include an instruction in the jury charge (1) setting forth the jailhouse informant witness corroboration rule in article 38.075, and (2) explaining that one jailhouse informant witness cannot corroborate another. The State concedes that this omission was error, and we agree. *See Phillips*, 463 S.W.3d at 65 (finding trial court erred by omitting article 38.075 instruction where inmate witnesses testified to statements made by appellant "that were against [appellant's] interest"); *see also* TEX. CODE CRIM. PROC. ANN. art. 38.075.

Again, because Willingham did not request the erroneously omitted instruction at trial, the error requires reversal only if Willingham was egregiously harmed by the error.[8] And again, we find that he did not suffer egregious harm. The non-jailhouse-informant testimony in this case included the extensive and detailed testimony of McDougald, upon

---

[8] When a jury charge contains multiple errors, appellate courts may assess the cumulative effect of the errors in determining whether the appellant suffered egregious harm. *See Chamberlain v. State*, 998 S.W.2d 230, 238 (Tex. Crim. App. 1999) ("It is conceivable that a number of errors may be found harmful in their cumulative effect."); *see also Alcoser v. State*, 663 S.W.3d 160, 171 (Tex. Crim. App. 2022) (noting that "it is possible that a synergistic effect based on multiple charge errors in a multi-count jury charge could weigh in favor of finding harm when consideration of the errors in isolation would not"). However, Willingham does not ask us to assess the cumulative effect of the errors in determining whether he suffered egregious harm; instead, both parties address harm separately in issues two and three. Accordingly, we do not address whether Willingham suffered egregious harm from any cumulative effect of the errors. *See* TEX. R. APP. P. 47.1.

20

which the State's case was principally based. Thus, even if the jury was instructed that jailhouse informant testimony must be corroborated by other evidence tending to connect Willingham with the commission of the offense, it is overwhelmingly likely that they would have found such corroboration. We overrule Willingham's third issue.

## C.    Costs and Fees

By his fourth issue, Willingham challenges the trial court's assessment of various court costs and fees in the final judgment.[9] "[W]e review the assessment of court costs on appeal to determine if there is a basis for the cost, not to determine if there was sufficient evidence offered at trial to prove each cost . . . ." *Johnson v. State*, 423 S.W.3d 385, 390 (Tex. Crim. App. 2014) (noting that "court costs are not part of the guilt or sentence of a criminal defendant, nor must they be proven at trial; rather, they are 'a nonpunitive recoupment of the costs of judicial resources expended in connection with the trial of the case'").

As noted above, the judgment of conviction assessed $3,027.22 in court costs against Willingham. A bill of costs signed by a deputy district clerk and included in the appellate record itemizes those costs as follows:

| FEE DESCRIPTION | CHARGES |
| --- | --- |
| Local Consolidated Court Costs | $105.00 |
| State Consolidated Court Costs | $185.00 |

---

[9] Willingham did not object to the fees at trial, but an appellant may challenge the "bases for the imposition of court costs for the first time on appeal." *Johnson v. State*, 423 S.W.3d 385, 390–91 (Tex. Crim. App. 2014) (noting that, "while some defendants in some cases may have an opportunity to recognize a basis to object to the imposition of court costs in open court if an itemized bill is available to them, most defendants . . . will not, because their court costs were not imposed in open court" and the judgment "contained only an aggregate figure—the accuracy of which may not be verifiable at the time of imposition").

| ASSESSED CHARGES | CHARGES |
|---|---|
| Issue Capias | $8.00 |
| Sheriff's Service Fee | $50.00 |
| Arrest | $5.00 |
| Commitment | $5.00 |
| Release | $5.00 |
| Taking and Approving Bond | $10.00 |
| Attorney Fee Voucher | $2,486.22 |
| Issue Subpoena | $168.00 |

Willingham contests all of the listed items other than the "Sheriff's Service Fee" and the "Commitment" fee.

### 1. Consolidated Fees

First, Willingham argues the local and state consolidated fees were improperly assessed because the statute authorizing those fees applies only to offenses occurring on or after January 1, 2020. *See* Act of May 23, 2019, 86th Leg., R.S., ch. 1352, §§ 5.01, 5.04, 2019 Tex. Gen. Laws 3981, 4035–36; *see also* TEX. LOC. GOV'T CODE ANN. §§ 133.102, .104. The State concedes that the revised statutes are not applicable and the assessed consolidated fees were therefore improper.

The parties agree that, in lieu of the $105 local consolidated fee, the applicable statutes authorized the assessment of a $4 juror service fee, a $40 district clerk fee, a $25 records management fee, a $5 courthouse security fee, a $4 judicial support fee, and a $2 indigent defense fee. *See* Act of May 27, 2007, 80th Leg., R.S., ch. 1014, § 6, 2007 Tex. Gen. Laws 3540, 3542 (repealed 2020) (former TEX. LOC. GOV'T CODE ANN.

22

§ 133.107) (authorizing $2 indigent defense fee); Act of Aug. 9, 2005, 79th Leg., 2d C.S., ch. 3, § 12, 2005 Tex. Gen. Laws 34, 37–38 (repealed 2020) (former TEX. LOC. GOV'T CODE ANN. § 133.105(a)) (authorizing $4 judicial support fee); Act of May 28, 2005, 79th Leg., R.S., ch. 804, § 2, 2005 Tex. Gen. Laws 2775, 2775–76 (repealed 2019) (former TEX. CODE CRIM. PROC. ANN. art. 102.005(f)) (authorizing $25 records management fee); Act of May 27, 2005, 79th Leg., R.S., ch. 1360, § 5, 2005 Tex. Gen. Laws 4255, 4256 (repealed 2019) (former TEX. CODE CRIM. PROC. ANN. art. 102.0045(a)) (authorizing $4 juror services fee); Act of Apr. 11, 1997, 75th Leg., R.S., ch. 12, § 1, 1997 Tex. Gen. Laws 51, 51–52 (amended 2019) (former TEX. CODE CRIM. PROC. ANN. art. 102.017(a)) (authorizing $5 courthouse security fee); Act of May 27, 1995, 74th Leg., R.S., ch. 764, § 1, 1995 Tex. Gen. Laws 3969, 3969 (repealed 2019) (former TEX. CODE CRIM. PROC. ANN. art. 102.005(a)) (authorizing $40 district clerk fee).

The parties further agree that, in lieu of the $185 state consolidated fee, the applicable statute authorized the assessment of a $133 state consolidated fee. *See* Act of June 2, 2003, 78th Leg., R.S., ch. 209, § 62(a), sec. 133.102(a)(1), 2003 Tex. Gen. Laws 979, 996 (amended 2019) (former TEX. LOC. GOV'T CODE ANN. § 133.102(a)(1)) (authorizing $133 state consolidated fee).

**2.    Attorney's Fees**

Willingham argues the court erred in assessing attorney's fees against him because (1) the State presented no evidence of his current financial resources or his ability to pay the fees, and (2) the trial court failed to make the findings required by article 26.05(g).

The code of criminal procedure provides that, "[i]f the judge determines that a

defendant has financial resources that enable the defendant to offset in part or in whole the costs of the legal services provided" by court-appointed counsel, "the judge shall order the defendant to pay during the pendency of the charges or, if convicted, as a reimbursement fee the amount that the judge finds the defendant is able to pay." TEX. CODE CRIM. PROC. ANN. art. 26.05(g). But such fees cannot be assessed against a defendant previously declared indigent unless there is proof and a finding that he is no longer indigent. *See Cates v. State*, 402 S.W.3d 250, 251 (Tex. Crim. App. 2013); *see also* TEX. CODE CRIM. PROC. ANN. art. 26.04(p) ("A defendant who is determined by the court to be indigent is presumed to remain indigent for the remainder of the proceedings in the case unless a material change in the defendant's financial circumstances occurs.").

In this case, the trial court found Willingham indigent and appointed counsel to represent him on August 4, 2020. The State concedes that there was no proof that Willingham was no longer indigent, nor was there any finding in that regard. It therefore agrees that the judgment should be modified to delete the attorney's fees assessment.

### 3. Capias and Subpoena Issuance Fees

Willingham argues that the $8 capias issuance fee and $168 subpoena issuance fees were improper because the $40 district clerk fee authorized by former article 102.005(a) specifically includes compensating a clerk for issuing subpoenas. The State concedes that "there is simply no basis in the record for an $8.00 capias fee." The State argues, however, that a subpoena issuance fee of $5 per witness was authorized under article 102.011(a). *See* TEX. CODE CRIM. PROC. ANN. art. 102.011(a) (authorizing a $5 fee to compensate a peace officer "for summoning a witness"). The State observes that the prosecution called twenty-five witnesses at trial, and the prosecutor indicated at trial that

24

all of those witnesses had been subpoenaed to appear; thus, it argues that the record supports a subpoena issuance fee of $125.

We agree with Willingham that both the $8 capias issuance fee and $168 subpoena issuance fees were improper. As Willingham notes, the statute which authorized the $40 district clerk fee—which Willingham concedes he is liable for, *see supra* part II.C.1—states that the fee "is for all clerical duties performed by the clerk, including . . . issuing original writs and subpoenas." Act of May 27, 1995, 74th Leg., R.S., ch. 764, § 1, art. 102.005(c)(4), 1995 Tex. Sess. Law Serv. 3969, 3969 (repealed 2019). We sustain this sub-issue.

### 4. Peace Officer Reimbursement Fees

Under the version of article 102.011 of the Texas Code of Criminal Procedure which is applicable to this case, a defendant convicted of an offense must pay certain fees "for services performed in the case by a peace officer." Act of May 30, 1987, 70th Leg., R.S., ch. 821, § 1, 1987 Tex. Gen. Laws 2835, 2835 (former TEX. CODE CRIM. PROC. ANN. art. 102.011(a)).

Willingham argues that the $5 arrest fee should not have been assessed because he was arrested pursuant to a warrant. *See* TEX. CODE CRIM. PROC. ANN. art. 102.011(a)(1) (authorizing a $5 fee "for issuing a written notice to appear in court following the defendant's violation of a traffic law, municipal ordinance, or penal law of this state, or for making an arrest without a warrant"); *cf. id.* art. 102.011(a)(2) (authorizing a $50 fee "for executing or processing an issued arrest warrant"). He contends the $10 fee for "taking and approving a bond" was improper because he "remained incarcerated for the duration and never made bond." *See id.* art. 102.011(a)(5)) (authorizing a $10 fee for

25

"taking and approving a bond and, if necessary, returning the bond to the courthouse"). Similarly, he argues the $5 "release" fee was improper because he was never released. *See id.* art. 102.011(a)(6) (authorizing a $5 fee "for commitment or release").[10]

The State agrees as to the warrantless arrest and bond fees, but it argues that the $5 "release" fee was proper because, following the judgment, Willingham was "released" from the custody of the Leon County Sheriff to the Correctional Institutions Division of the Texas Department of Criminal Justice. We agree with the State. The terms "commitment" and "release" as used in article 102.011(a)(6) "refer[] to a defendant's commitment to and release from jail." *Williams v. State*, 495 S.W.3d 583, 591 (Tex. App.—Houston [1st Dist.] 2016, pet. dism'd) (citing *Adams v. State*, 431 S.W.3d 832, 838 (Tex. App.—Houston [14th Dist.] 2014, no pet.)). Here, as in *Williams*, the judgment of conviction requires the local sheriff to transfer the appellant from the county jail to the Texas Department of Criminal Justice. *See id.* Accordingly, we conclude that the $5 "release" fee was properly assessed but the warrantless arrest and bond fees were improper.[11]

### 4. Summary

We modify the judgment to reflect that the fee for local consolidated court costs is $80 and the fee for state consolidated court costs is $133. Further, we modify the

---

[10] Willlingham was assessed both a "Commitment" and a "Release" fee under this statute. He does not argue that the assessment of two fees under the same statute was improper.

[11] Like the appellant in *Williams*, Willingham cites a 2014 Texas Attorney General Opinion for the proposition that article 102.011(a)(6) does not authorize a fee for transfer occurring after judgment is rendered because such action is not a "service[] performed in the case." *See* Tex. Att'y Gen. Op. No. GA-1063, at *5 (2014) ("A court could . . . conclude that any commitment or release from jail after the conclusion of the case will not be a service performed 'in' the case and that article 102.011(a)(6) does not authorize fees for those services."). However, "Attorney General's opinions, although persuasive authority, are not binding on the courts of this state." *Williams v. State*, 495 S.W.3d 583, 591 n.7 (Tex. App.—Houston [1st Dist.] 2016, pet. dism'd) (citing *Holmes v. Morales*, 924 S.W.2d 920, 924 (Tex. 1996); *Cavender v. Hous. Distrib. Co.*, 176 S.W.3d 71, 73 (Tex. App.—Houston [1st Dist.] 2004, pet. denied)).

judgment to delete the $8 capias issuance fee, the $5 warrantless arrest fee, the $10 bond fee, the $2,486.22 attorney's fee, and the $168 subpoena issuance fee. Pursuant to these modifications, the judgment shall reflect total court costs of $273.

### III.   CONCLUSION

The trial court's judgment is affirmed as modified herein. See TEX. R. APP. P. 43.2(b).

DORI CONTRERAS
Chief Justice

Do not publish.
TEX. R. APP. P. 47.2 (b).

Delivered and filed on the
3rd day of August, 2023.